UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK HACKER, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 9708 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Mark Hacker brought this suit against United Airlines, Inc., alleging that it violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when it twice suspended him from his customer service position and later placed him on extended illness leave. Doc. 26. United moves for summary judgment. Doc. 60. The motion is granted.

### Background

The following facts are stated as favorably to Hacker as permitted by the record and Local Rule 56.1. *See Woods v. City of Berwyn*, 803 F.3d 865, 867 (7th Cir. 2015). In considering United's motion, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, LLC, 805 F.3d 278, 281 (7th Cir. 2015).

Hacker, currently in his mid-50s, worked from 1988 through 2016 as a United customer service representative at Chicago's O'Hare International Airport. Doc. 26 at ¶ 52; Doc. 68 at p. 1, ¶ 1; Doc. 69 at p. 8, ¶ 69. His responsibilities included baggage handling, assisting passengers with lost and damaged luggage claims, working at the baggage-claim counter, and rebooking customers. Doc. 69 at pp. 8-9, ¶ 70.

Hacker suffers from depression, anxiety, difficulty with concentration and decreased focus, fainting and dizziness, anger, and low blood sugar. Doc. 68 at pp. 2-3, ¶ 6; Doc. 69 at p. 2, ¶ 50. In December 2012, he sued United for disability-, but not age-based, discrimination. Doc. 68 at p. 2, ¶ 3; *see Hacker v. United Airlines, Inc.*, No. 12 C 10239 (N.D. Ill. filed Dec. 21, 2012). That suit was voluntarily dismissed in September 2013 pursuant to a settlement. Doc. 68 at p. 2, ¶ 3; *see Hacker*, No. 12 C 10239, Dkts. 20-23.

## A. Events in 2015

Hacker applied in April 2015 for permission under the Family and Medical Leave Act ("FMLA"), 42 U.S.C. § 2601 *et seq.*, to take up to five days' medical leave a maximum of eighteen times a year. Doc. 64-2 at 141; Doc. 68 at p. 2, ¶ 4. His application disclosed a "seizure"-like episode during which he temporarily lost consciousness. Doc. 64-2 at 142; Doc. 68 at p. 2, ¶ 5; Doc. 69 at p. 1-2 at ¶ 49. After reviewing the application, Dr. Thomas Faulkner— a physician consultant for United's medical department—expressed concern about Hacker's and other United employees' safety stemming from the episode and related "psychological issues." Doc. 64-6 at pp. 2-3, ¶¶ 2, 4-5; Doc. 68 at p. 3, ¶ 7.

On June 15, United's medical department removed Hacker from work, "contingent on receiving and reviewing [additional] documentation from his [n]eurologist and [p]sychiatrist that supports that both his condition and treating medications are clinically stable and not adversely impacting his ability to perform … his job." Doc. 64-6 at 6; Doc. 68 at p. 3, ¶¶ 7-8; Doc. 69 at p. 1, ¶ 48. United sought information from Hacker's neurologist, Dr. Lenny Cohen, concerning the "type/nature and origin of the seizures" and the stability of his "seizures over time with treatment." Doc. 64-2 at 144. United also sought information from Hacker's psychiatrist, Dr. Steve Kim, concerning any "restrictions … that would prevent [him] from performing the job

duties[,] … [his] current ability to perform physical and safety sensitive duties," and his "[c]urrent treatment plan" and "complia[nce] with the treatment." *Ibid.*

On July 5, Hacker submitted a letter from Dr. Kim, which stated that his "[c]urrent treatment includes medication management and follow up appointments with me." Doc. 64-2 at 145. Dr. Kim added that he "advised [Hacker] to also follow up with his therapist and [United] EAP (Employee Assistance Program Counselor)." *Ibid.*; Doc. 69 at p. 2, ¶ 50. Hacker also submitted a letter from Dr. Cohen, which noted that his "seizure like episode" was "isolated" and "most likely attributable to medications that he was taking at that time." Doc. 69-3 at 136.

Some two weeks later, United requested "[d]ocumentation from … Dr. Kim indicating attendance and participation in the counseling prescribed." Doc. 64-2 at 146; Doc. 68 at p. 4, ¶ 10; Doc. 69 at p. 2, ¶ 51. Hacker submitted a follow-up letter from Dr. Kim in late August. Doc. 64-2 at 147; Doc. 68 at p. 4, ¶ 11; Doc. 69 at p. 2, ¶ 52. Dr. Kim wrote that Hacker "states he is currently looking for a new therapist closer to home due to [a] driving restriction from his neurologist." Doc. 64-2 at 147; Doc. 68 at p. 4, ¶ 11; Doc. 69 at p. 2, ¶ 52. Dr. Kim added that Hacker "met with EAP[,] who recommended that [he] follow-up with an outside therapist." Doc. 64-2 at 147; Doc. 69 at p. 2, ¶ 52.

On August 28, United cleared Hacker to return to work on the condition that he not "operat[e] machinery," "driv[e] company vehicles," or "work[] at heights including platforms and ladders." Doc. 64-2 at 148; Doc. 64-6 at p. 3, ¶ 7; Doc. 68 at p. 4, ¶ 12; Doc. 69 at pp. 2-3, ¶ 53. During his absence, Hacker received sick pay at his normal hourly rate. Doc. 68 at p. 4, ¶ 12. Although it cleared Hacker for work, United requested additional information from his "treating counselor or therapist" to "confirm[]" that he was "working with this counselor or therapist as stipulated by Dr. Kim" and was "compl[ying] with attendance, visits and the

prescribed treatment regimen." Doc. 64-2 at 148; Doc. 64-6 at p. 4, ¶ 8; Doc. 68 at p. 4, ¶ 13; Doc. 69 at pp. 2-3, ¶ 53. United warned Hacker that "[f]ailure to provide this updated documentation by the 30th of September may result in your being removed from the work environment." Doc. 64-2 at 148; Doc. 68 at p. 4, ¶ 13.

Hacker submitted a letter on October 9 from Dr. Maryam Sandoval, which stated that he "[m]ay return to work on 10/13/15 without restrictions." Doc. 69-3 at 137. The letter did not describe a course of therapy or his compliance with any treatment plan. *Ibid*. Although Hacker's Local Rule 56.1(b)(3)(C) statement characterizes Dr. Sandoval as a therapist, Doc. 68 at p. 15, ¶ 54, the cited material suggests that she is an internist, Doc. 69-3 at 137. On October 19, United acknowledged receiving the "medical information … from Dr. Maryam Sandoval," but noted that it had "not received the requested information[] that you have been working with [a] counselor or therapist as stipulated by Dr. Kim (Psychiatrist) and are compliant with attendance, visits and the prescribed treatment regimen." Doc. 64-2 at 149; Doc. 68 at p. 5, ¶ 14; Doc. 69 at p. 3, ¶ 55.

A week later, Dr. Tiffany Taft, a licensed clinical psychologist, sent United a letter "advis[ing] that … Hacker began individual psychotherapy at Oak Park Behavioral Medicine LLC on October 12th." Doc. 68-2 at 16; Doc. 69 at p. 3, ¶ 56. Dr. Taft noted that Hacker had had "1 initial consultation (10/12) and 2 treatment sessions (10/19 and 10/26)," and that the "current plan is for weekly individual cognitive behavioral therapy which Mr. Hacker is compliant with." Doc. 68-2 at 16.

On November 19, Hacker suffered an episode of "[f]ainting and [d]ehydration" and was treated in the emergency room. Doc. 64-2 at 150; Doc. 69 at p. 4, ¶ 57.

### B.     Events in 2016 and 2017

On February 3, 2016, Hacker's treatment at Oak Park Behavioral Medicine was "terminated" for several reasons, including Dr. Kim's "concerns about treatment consistency" there and Hacker's own "inconsistency in attending appointments."  Doc. 64-2 at 151; Doc. 68 at p. 5, ¶ 16.  All told, Hacker received seven treatment sessions, including the initial appointment on October 12, 2015.  Doc. 64-2 at 151; Doc. 68 at p. 5, ¶ 16.

On March 16, 2016, United again removed Hacker from his position, citing his "self-disclosure" of the November 2015 "seizure."  Doc. 64-2 at 152; Doc. 68 at pp. 5-6, ¶ 17; Doc. 69 at p. 4, ¶ 58.  In a letter sent to Hacker on that date, United stated: "United's Corporate Medical Department directed on October 19, 2015 that additional information was needed to be able to work in your position as a Customer Service Representative.  Failure to provide this updated documentation has resulted in you being removed from the work environment … ."  Doc. 64-2 at 152.  Although United does not dispute that it received Dr. Taft's late October 2015 letter outlining a proposed course of therapy, United's March 16 letter did not refer to it, nor did it mention that Hacker's treatment at Oak Park had terminated.  Doc. 69 at pp. 4-5, ¶ 59.

United's March 16 letter requested additional information from Drs. Cohen and Kim to clear Hacker to return to work.  Doc. 64-2 at 152; Doc. 68 at p. 6, ¶ 18.  From Dr. Kim, United sought Hacker's "[c]urrent clinical status," "[c]urrent restrictions … that would prevent [him] from performing the job duties," "current ability to perform physical and safety sensitivity duties," "[c]urrent treatment plan," and information regarding whether he was "compliant with the treatment."  Doc. 64-2 at 152.  From Dr. Cohen, United sought information concerning the "type/nature and origin of the seizures" and his opinion as to whether Hacker was "capable of returning to work and able to perform all physical and safety sensitive duties."  *Ibid*.

Two weeks later, Hacker submitted a letter from Dr. Kim indicating that his "[c]urrent treatment plan includes medication management and therapy," and that he was "seeing his therapist weekly" and was "compliant with his treatment." Doc. 64-2 at 154; Doc. 68 at pp. 6-7, ¶ 19; Doc. 69 at p. 5, ¶ 60. Dr. Kim added: "Mark [Hacker] states that he will still be able to perform his job duties, including lifting bags and helping customers." Doc. 64-2 at 154; Doc. 68 at pp. 6-7, ¶ 19; Doc. 69 at p. 5, ¶ 60. The letter did not state whether, in *Dr. Kim's* opinion, there were any restrictions that would prevent Hacker from performing his job duties. Doc. 64-2 at 154; Doc. 68 at pp. 6-7, ¶ 19. Hacker also submitted a letter from Dr. Cohen, which stated that he did not "see any restrictions that [would] limit [Hacker's] ability to work at his usual capacity." Doc. 64-2 at 155; Doc. 68 at p. 7, ¶ 20; Doc. 69 at p. 5, ¶ 61. Dr. Cohen's letter added that Hacker did not "need to take any anti-seizure medications" and did not "have a diagnosis of epilepsy." Doc. 64-2 at 155.

United responded in a letter dated April 4, acknowledging that the medical department had reviewed the materials submitted by Drs. Cohen and Kim, but requesting "additional information"—to be submitted on or before April 18—before Hacker could be cleared to return to work. Doc. 64-2 at 156; Doc. 68 at p. 7, ¶ 21. United sought from Dr. Cohen a "[s]igned and dated customer service job description," and from Dr. Kim information on the "[c]urrent stability of [Hacker's] condition" and a "[s]igned and dated customer service job description indicating the ability to perform all job duties without any physical or cognitive restrictions." Doc. 64-2 at 156; Doc. 68 at p. 7, ¶ 21.

Hacker did not submit the materials United requested, and United notified him on May 25 that he had been placed on Extended Illness Status ("EIS"), effective that day. Doc. 64-2 at 157; Doc. 68 at p. 7, ¶ 22; Doc. 69 at p. 6, ¶ 63. (Hacker disputes United's assertion that he did

not provide the requested materials.  Doc. 68 at p. 7, ¶ 22.  But Hacker does not cite anything in the record to support his position; indeed, he states that he is "unaware" of what he submitted to United.  The court thus treats as admitted United's assertion that Hacker did not provide the materials requested in its April 4 letter.  *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial."); *Schwab v. N. Ill. Med. Ctr.*, 42 F. Supp. 3d 870, 874 (N.D. Ill. 2014) ("[T]he court will disregard any of Schwab's assertions … that are not supported with specific record citations.").)

United's May 25, 2016 letter informing Hacker that he had been placed on EIS explained that, under the terms of the applicable collective bargaining agreement, EIS begins automatically "on the seventeenth consecutive calendar day following the first day of unpaid sick leave."  Doc. 64-2 at 157; *see also id*. at 75 ("An employee unable to work due to illness or injury who exhausts his or her sick leave will be placed on active no-pay status for 16 days.  Thereafter, if the employee remains unable to work, he or she will be placed on [EIS].").  An employee placed on EIS continues to accrue seniority and maintain health benefits, and may return to work "if the employee's medical condition improves to the point that he can perform the essential functions of his job with or without a reasonable accommodation."  Doc. 68 at pp. 7-8, ¶ 24.

In early June, Hacker submitted a signed customer service job description from Dr. Cohen, dated May 31, advising that Dr. Cohen had "reviewed" the description and opining that Hacker "is able to return to full duty as of 5/31/16."  Doc. 68-2 at 25; Doc. 68 at p. 7, ¶ 23; Doc. 69 at p. 6, ¶ 64.  Hacker also submitted an "absence certificate," dated June 3, from Dr. Kim, describing Hacker as suffering from "depression, anxiety, aggravation, anger, and decreased

sleep." Doc. 64-2 at 159; Doc. 68 at p. 8, ¶ 26. Dr. Kim's certificate indicated that Hacker's "general treatment plan" was "medication management and individual psychotherapy (with Theresa Wier, Ph.D.)." Doc. 64-2 at 159. The certificate further indicated that Hacker was not to perform "jet bridge work." *Ibid.*; Doc. 69 at p. 6, ¶ 65. Although the certificate stated that "United Airlines has not allowed patient to work[] since 3/28/16→present," Dr. Kim did not indicate whether, in his opinion, Hacker was able to return to work, either with or without restrictions. Doc. 64-2 at 159; Doc. 68 at p. 8, ¶ 26; Doc. 69 at p. 6, ¶ 65; Doc. 69-7 at 11.

On June 8, United sent another letter to Hacker. Given the lack of clarity in Dr. Kim's June 3 certificate, United sought: (1) the "[c]urrent clinical status and stability of the depression, anxiety, difficulty concentrating, decreased focus, anger and aggravation as indicated on the original FMLA documentation" that Hacker submitted in April 2015; and (2) "[i]f the intent is a clearance to return to work," information on Hacker's "complian[ce] with the treatment plan indicated on the [June 3] absence certificate," "the duration of the restriction 'no jet bridge work,'" "a specific return to work date" with any restrictions, and a "[s]igned and dated Customer Service job description indicating the ability to perform all job duties without physical restriction and/or cognitive limitations." Doc. 64-2 at 160; Doc. 68 at p. 8, ¶ 27.

Six days later, Hacker submitted a second absence certificate from Dr. Kim, dated June 14. Doc. 64-2 at 161. This time, Dr. Kim stated that Hacker was "unable to work … indefinite[ly]" and had made "[l]imited progress" in his treatment. *Ibid.*; Doc. 68 at p. 9, ¶ 28. On July 19, United sought Hacker's permission "to communicate with Dr. Kim directly" to clarify "whether Dr. Kim meant [Hacker was] unable to return to work for a specified period of time or indefinitely." Doc. 64-2 at 162; Doc. 68 at pp. 9-10, ¶ 31. Hacker refused. Doc. 68 at p. 10, ¶ 32.

From July 2016 until the close of fact discovery in November 2017, Doc. 47, Hacker submitted at least ten additional absence certificates reflecting Dr. Kim's opinion that he was unable to return to work: at least two in 2016 (July 25 and September 19), and eight in 2017 (January 2, January 30, February 27, March 24, April 26, May 20, July 24, and August 28). Doc. 64-2 at 165-183; Doc. 68 at p. 9, ¶ 29.

Hacker filed this suit on October 13, 2016, after filing a charge of discrimination with the Equal Employment Opportunity Commission and receiving a right to sue letter. Doc. 26 at ¶ 9. He remains on EIS. Doc. 68 at p. 9, ¶ 30; Doc. 69 at p. 6, ¶ 66. After fact discovery closed, Dr. Kim signed an absence certificate, dated December 3, 2017, indicating that Hacker was able to work with restrictions. Doc. 68 at p. 17, ¶ 67; Doc. 68-2 at 29.

### Discussion

Hacker's complaint has four counts. Counts I and III allege that United unlawfully discharged Hacker due to his disabilities and age by twice suspending him from his position and later placing him on EIS. Doc. 26 at ¶¶ 27-37 (Count I), 50-67 (Count III). Counts II and IV allege that United unlawfully retaliated against Hacker for having filed the 2012 ADA suit against United and for making unspecified complaints about age discrimination. *Id*. at ¶¶ 38-49 (Count II), 68-72 (Count IV).

## I.     ADA and ADEA Discrimination Claims

### A.     ADA Discrimination Claim

"The ADA imposes liability on employers who discriminate in the terms and conditions of a qualified individual's employment on the basis of a disability and requires that employers make reasonable accommodations for qualified individuals' disabilities." *Harris v. Allen Cnty. Bd. of Comm'rs*, 890 F.3d 680, 683 (7th Cir. 2018) (citing 42 U.S.C. § 12112(a) & (b)(5)(A)).

"In order to defeat summary judgment on [a] disability discrimination claim, [a plaintiff] must point to evidence capable of establishing that (1) [he] is a person with a disability within the meaning of the ADA … ; (2) [he] is qualified to perform the essential functions of [his] job with or without a reasonable accommodation; and (3) [he] suffered from an adverse employment decision as a result of [his] disability." *Guzman v. Brown Cnty.*, 884 F.3d 633, 641 (7th Cir. 2018). Hacker fails to satisfy the third requirement because he cannot "show a genuine issue of material fact exists regarding whether his disability was the 'but for' reason" for his being suspended and placed on EIS. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017) (quoting *Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 962 (7th Cir. 2010)).

Under the framework set forth in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), an ADA plaintiff must present evidence that, considered as a whole, would allow a reasonable juror to conclude that he suffered discrimination due to a perceived or actual disability. *See Monroe*, 871 F.3d at 504 (applying *Ortiz* to an ADA claim); *Knapp v. Evgeros, Inc.*, 205 F. Supp. 3d 946, 956 (N.D. Ill. 2016) (same). To meet that burden, the plaintiff may rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)—namely, a pattern of evidence showing that the plaintiff belonged to a protected class, met his employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class who were treated better, provided that the defendant fails to articulate a reasonable alternative explanation or the plaintiff shows that the proffered alternative explanation is a pretext. *See Ortiz*, 834 F.3d at 765-66. But the pattern identified in *McDonnell Douglas* is just one way the record can enable a reasonable juror to find discrimination. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (noting that *McDonnell Douglas* provides "a

common, but not exclusive, method of establishing a triable issue of intentional discrimination")
(internal quotation marks omitted).  A court therefore must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader and dispositive question whether "a reasonable factfinder [could] conclude that … [a] proscribed factor caused the discharge or other adverse employment action."  *Ortiz*, 834 F.3d at 765.

Because the parties present their arguments under *McDonnell Douglas*, the court "begin[s] its] assessment of the evidence by employing that construct and addressing first whether [Hacker] has established a prima facie case of discrimination."  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).  The court then will "assess cumulatively all the evidence" in the summary judgment record "to determine whether it permits a reasonable factfinder to determine" that Hacker was suspended and placed on EIS because of his disabilities.  *Ibid*.; *see Knapp*, 205 F. Supp. 3d at 957.

### 1.  *McDonnell Douglas* Analysis

As the Seventh Circuit has explained:

> Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing [a prima facie case] that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer.  If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.

*David*, 846 F.3d at 225 (citations, brackets, and internal quotation marks omitted).  Hacker fails to present a prima facie case under *McDonnell Douglas* for several reasons.

*Second Component*.  As to the second component of the prima facie case, United

contends that Hacker did not meet its legitimate performance expectations because he

consistently failed to respond to its requests for information "confirming his participation in

psychiatric treatment and his compliance with the prescribed treatment plan."  Doc. 62 at 7.

United adds that Hacker did not meet its legitimate performance expectations because Dr. Kim

never indicated that Hacker was able to return to work, and in fact affirmatively indicated that he

was *not* able to return to work.  *Ibid*.  United is correct.

On June 14, 2016, Hacker submitted an absence certificate from Dr. Kim indicating that

his medical conditions prevented him from working, and from June 2016 through the close of

fact discovery in November 2017, Hacker submitted at least ten additional absence certificates

from Dr. Kim, all stating categorically that he could not work at his job.  Doc. 68 at p. 9, ¶¶ 28-

29.  Given that an employer may expect regular attendance from an employee, *see In re UAL*

*Corp.*, 300 F. App'x 424, 426 (7th Cir. 2008) ("Vann has failed to point to evidence that would

permit a finding that she met United's legitimate performance expectations, including work

attendance."); *Waggoner v. Olin Corp.*, 169 F.3d 481, 483 (7th Cir. 1999) ("It should not require

saying that generally attendance is a requirement of a job."), Hacker's prima facie case fails as to

the post-June 14, 2016 period because, according to his own psychiatrist, he could not work.

As to the pre-June 14, 2016 period, the record shows that Hacker did not comply with

United's requests for additional information about his condition and treatment plan.  An

employer may expect an employee to respond to reasonable requests for information about

whether he is medically capable of performing his job responsibilities.  *See Thomas v. Corwin*,

483 F.3d 516, 529 (8th Cir. 2007) ("By refusing to provide Dr. Harris the opportunity to review

her medical records and to discover the root of Thomas's stress and anxiety, Thomas created a

stalemate in which KCPD had little choice but to terminate Thomas rather than return her to the position from which Thomas's stress and anxiety originated."); *Pough v. SBC Commc'ns, Inc.*, 570 F. Supp. 2d 1006, 1014-15 (N.D. Ill. 2008) ("Following her second suspension, Dr. Cooperman opined that [the plaintiff] should not be permitted to return to work, and that she was in need of medication and psychotherapy. SMAART attempted to contact Plaintiff numerous times to determine whether she could maintain eligibility for disability benefits, but she did not cooperate. After nearly six months of absence from work, Plaintiff was advised that she must either provide a medical release demonstrating her ability to return to work, or submit information showing a continued need for medical leave, but she did not do so. Based on her disruptive and uncooperative conduct, Defendants have shown that Plaintiff was not meeting their legitimate expectations.") (citations omitted). The record evidence here shows that Hacker consistently and materially failed to comply with United's reasonable requests for additional information about his condition and proposed course of treatment.

After the first episode, United twice sought confirmation that he was working with a counselor or therapist: on July 17 and August 28, 2015. Doc. 64-2 at 146, 148; Doc. 64-6 at p. 4, ¶ 8; Doc. 68 at p. 4, ¶ 13; Doc. 69 at pp. 2-3, ¶¶ 51, 53. Despite United's warning that "[f]ailure to provide this updated documentation by the 30th of September may result in your being removed from the work environment," Doc. 64-2 at 148; Doc. 68 at p. 4, ¶ 13, Hacker waited until October 26 to submit information about whether he had begun psychotherapy. Doc. 68-2 at 16; Doc. 69 at p. 3, ¶ 56.

United then asked Hacker on March 16 and April 4, 2016 for Dr. Kim's opinion on "[c]urrent restrictions … that would prevent [him] from performing the job duties and the current ability to perform physical and safety sensitivity duties." Doc. 64-2 at 152, 156. Hacker did not

provide responsive materials before May 25, 2016, when United placed him on EIS. In the note

that Hacker submitted on March 30, 2016, Dr. Kim wrote only that *Hacker* "states that he will

still be able to perform his job duties, including lifting bags and helping customers." Doc. 64-2

at 154. And on June 3, 2016, Hacker submitted an absence certificate from Dr. Kim that did not

indicate whether he was able to return to work, either with or without restrictions. Doc. 64-2 at

159; Doc. 68 at p. 8, ¶ 26; Doc. 69 at p. 6, ¶ 65; Doc. 69-7 at 11. It was only after United sent

another letter to Hacker on June 8, 2016, Doc. 64-2 at 160; Doc. 68 at p. 8, ¶ 27, that Hacker

submitted the June 14, 2016 absence certificate from Dr. Kim indicating that Hacker could *not*

work. Given Hacker's overall lack of responsiveness, no reasonable juror could find that he was

meeting United's legitimate performance expectations.

 *Third Component*. As to the third component of the prima facie case, United contends

that Hacker did not suffer an adverse employment action in 2015 because he received sick pay at

his normal hourly rate while on leave and returned to his same job at the same pay rate in

August. Doc. 62 at 4 n.1. Hacker's response brief does not address this argument, Doc. 67 at 7

(erroneously contending that United "has not contested the presence of an adverse employment

action"), thus forfeiting the point. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir.

2007) ("[A] party forfeits any argument it fails to raise in a brief opposing summary judgment.");

*Boogaard v. Nat'l Hockey League*, 126 F. Supp. 3d 1010, 1026-27 (N.D. Ill. 2015) (citing cases).

 United is correct on the merits in any event. "Adverse employment actions generally fall

into three categories: (1) termination or reduction in compensation, fringe benefits, or other

financial terms of employment; (2) transfers or changes in job duties that cause an employee's

skills to atrophy and reduce future career prospects; and (3) unbearable changes in job

conditions, such as a hostile work environment or conditions amounting to constructive

discharge." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (internal

quotation marks omitted).  Given that Hacker's benefits were maintained during his leave in

2015, and further that he returned to work in the same position with the same essential

responsibilities, Doc. 64-2 at 148; Doc. 64-6 at p. 3, ¶ 7; Doc. 68 at p. 4, ¶ 12; Doc. 69 at pp. 2-3,

¶ 53, no reasonable juror could conclude that Hacker suffered an adverse employment action in

2015.  *See James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (holding that the

plaintiff had not suffered an adverse employment action because he "returned to work … to the

same position, shift, and seniority level as before his leave of absence"); *Maclin v. SBC

Ameritech*, 520 F.3d 781, 789 (7th Cir. 2008) ("An employee has not suffered an adverse

employment action if her title changes but her position remains the same in terms of

responsibilities, salary, benefits and opportunities for promotion."); *O'Neal v. City of Chicago*,

392 F.3d 909, 911-14 (7th Cir. 2004) (same).

    *Fourth Component*.  As to the fourth component of the prima facie case, United contends

that Hacker does not identify any similarly situated employee outside of the protected class who

was treated more favorably than he was.  Doc. 62 at 8-9.  This is correct as well.  Hacker

concedes that all three individuals he identified as potential comparators have disabilities.  Doc.

67 at 11-12; Doc. 68 at p. 12, ¶ 42.  This is a problem, as Hacker's burden is to show that

"similarly situated persons *outside* the protected class received more favorable treatment from

the employer," *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 202 (7th Cir. 2013) (emphasis

added), not that United treated other individuals with disabilities better than it treated him.

Accordingly, Hacker's prima facie case fails for this reason as well.  *See Bates v. City of

Chicago*, 726 F.3d 951, 955 (7th Cir. 2013) (holding that the plaintiff did not establish a prima

facie case of racial discrimination under Title VII because he could not show that he was "treated worse than similarly situated firefighters who were not black").

Even if Hacker made a prima facie case under *McDonnell Douglas*, he fails to show that United's stated reasons for suspending him were pretextual. To meet his burden of rebutting United's nondiscriminatory reasons for suspending him and later placing him on EIS, Hacker "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) (internal quotation marks omitted). "Pretext is more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 743-44 (7th Cir. 2011) (alterations and internal quotation marks omitted), *overruled on other grounds by Ortiz*, 834 F.3d at 764-65. Hacker points to no record evidence from which a reasonable juror could find that United was dishonest in expressing its concerns that his condition posed a potential danger to himself or others or in insisting upon additional information about his course of treatment and compliance with his prescribed regimen. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (holding that the defendant was entitled to summary judgment where the plaintiff did not "cite any evidence that would allow for a reasonable inference that [his employer] did not have honest concerns about his communication style and behavior").

To the contrary, Hacker's own psychiatrist not only never cleared him to work, but also affirmatively certified at least ten times in 2016 and 2017 that he was unable to work. Doc. 64-2 at 165-183; Doc. 68 at p. 9, ¶ 29. Bolstering United's submission that its concerns were not

pretextual is the fact that United cleared Hacker to return to work in late August 2015 immediately after he submitted the required follow-up information from Dr. Kim indicating that he was "currently looking for a new therapist closer to home due to [a] driving restriction from his neurologist" and that he had "met with [United's] EAP who recommended that [he] follow-up with an outside therapist." Doc. 64-2 at 147-148; Doc. 64-6 at p. 3, ¶ 7; Doc. 68 at pp. 3-4, ¶¶ 9-12; Doc. 69 at p. 1-3, ¶¶ 49-53. Only when United learned that Hacker had suffered another seizure-like episode did it seek updates about his condition, and as already described, matters thereafter played out unsatisfactorily.

### 2. Cumulative Assessment

For substantially the same reasons, Hacker fares no better when the evidence is assessed cumulatively, without the aid of the *McDonnell Douglas* framework. Rather, the evidence taken as a whole shows that United acted for non-discriminatory reasons.

The crucial facts are these. United restored Hacker to his position in August 2015 once he provided information from Dr. Kim indicating that he was seeking a new therapist and had spoken with United's EAP counselor. Doc. 64-2 at 147; Doc. 68 at p. 4, ¶¶ 11-12; Doc. 69 at pp. 2-3, ¶ 53. After Hacker suffered his second episode in November 2015, triggering United's request for information in March 2016, Dr. Kim *never* cleared him to return to work—first by omission and then explicitly. Doc. 64-2 at 154, 159, 161; Doc. 68 at pp. 6-9, ¶¶ 19, 26, 28; Doc. 69 at pp. 5-6, ¶¶ 60, 65; Doc. 69-7 at 11. Moreover, at the time United suspended him in March 2016, Hacker had not complied with his psychotherapy regimen. Doc. 64-2 at 151, 152; Doc. 68 at pp. 5-6, ¶¶ 16-17; Doc. 69 at p. 4, ¶ 58. Matters had not changed when Hacker was placed on EIS in May 2016. Against this factual backdrop, no reasonable juror could find that United discriminated against Hacker on the basis of an actual or perceived disability.

It follows that United is entitled to summary judgment on the ADA discrimination claim.

\* \* \*

As noted, Dr. Kim cleared Hacker to return to work on December 3, 2017, more than a year after he filed this suit, some ten months after he amended his complaint, and about a month after fact discovery closed. Docs. 1, 26, 47; Doc. 68 at p. 17, ¶ 67; Doc. 68-2 at 29. Hacker, however, did not seek leave to further amend his complaint to bring a claim regarding United's response (or lack thereof) to Dr. Kim's December 2017 clearance, and did not seek to extend the discovery deadline. Hacker cannot now amend his complaint through his summary judgment opposition to bring such a claim. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'") (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002)); *see also Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 808 (7th Cir. 2014) (noting that "new and drastic factual allegations of motivation for the discriminating party's action [may not be] proffered at the summary judgment stage"). That claim could perhaps—subject to any applicable defenses—serve as the ground for a new suit against United, but it cannot be brought here. *See Anderson*, 699 F.3d at 997; *Scott v. Pinas*, 2017 WL 3979101, at \*5 n.7 (N.D. Ill. Sept. 11, 2017) ("Plaintiff's response brief discusses a third occasion [on which the defendant treated him] … , but this treatment was not described in his complaint and occurred outside the period of time on which his complaint is based. Plaintiff never amended his complaint to include allegations related to this treatment. Thus, the Court declines to consider it.").

## B. ADEA Discrimination Claim

The ADEA "makes it unlawful for an employer … 'to … discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age.'"  *Carson v. Lake Cnty.*, 865 F.3d 526, 532 (7th Cir. 2017)

(quoting 29 U.S.C. § 623(a)(1)).  For the reasons given above as to Hacker's ADA claim, the

record would not permit a reasonable juror to find that the actions of which Hacker complains

were taken because of his age, and so United is entitled to summary judgment on the ADEA

discrimination claim as well.  *See Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719-20 (7th Cir.

2018) (applying *Ortiz* to an ADEA claim); *Carson*, 865 F.3d at 532-33 (same); *Potnick v. Vill. of*

*Glenview*, 2018 WL 1064589, at *7 (N.D. Ill. Feb. 27, 2018) (same).

## II.      ADA and ADEA Retaliation Claims

A plaintiff pursuing a retaliation claim under the ADA or the ADEA must "identify

evidence showing that (1) [he] engaged in a statutorily protected activity; (2) [he] suffered an

adverse employment action; and (3) there is a causal connection between the two."  *Guzman*, 884

F.3d at 642 (ADA); *see also Skiba*, 884 F.3d at 718 (ADEA).

As for Hacker's ADEA retaliation claim, the record would not permit a reasonable juror

to find that he engaged in statutorily protected activity, as his 2012 suit against United did not

bring an ADEA claim, Doc. 68 at p. 2, ¶ 3, and he identifies no other instance in which he

complained of age discrimination.  Accordingly, United is entitled to summary judgment on the

ADEA retaliation claim.  *See Howard v. Indianapolis Pub. Sch.*, __ F. App'x __, 2018 WL

1251826, at *3 (7th Cir. Mar. 12, 2018) ("[T]he judge correctly explained that a report of

misconduct … must concern … age discrimination to be protected activity under the ADEA.");

*Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) (noting that

"[a] retaliation claim arises when an employee engages in activity protected by Title VII and

suffers an adverse employment action as a result," and holding that the defendant was entitled to

judgment because the complaints for which the employer allegedly retaliated against the employee fell "outside the ambit of Title VII").

As for Hacker's ADA retaliation claim, he fails to demonstrate the requisite causal connection between his 2012 lawsuit, on the one hand, and his suspensions and placement on EIS, on the other. *See Lauth*, 863 F.3d at 717 (holding that the defendant was entitled to summary judgment where the plaintiff "fail[ed] to point to evidence, circumstantial or otherwise, from which a jury could infer" a connection "between [his] filing … EEOC charges and his termination"). Hacker agrees that his ADA retaliation claim centers on the actions of two United employees, Sandy Truesdale and Sean Nash. Doc. 67 at 15; Doc. 68 at p. 11-12, ¶¶ 38-39. But Hacker concedes that neither individual was responsible for removing him from his duties in June 2015 or March 2016. Doc. 67 at 15. In fact, the summary judgment record indicates that Truesdale was not an employee in the medical department and that Hacker was simply dissatisfied with the assistance she provided in his efforts to return to work. Doc. 68 at p. 12, ¶ 40. For his part, Nash simply failed to respond to Hacker's efforts to contact him. *Id*. at ¶ 41. Nor does the summary judgment record reflect that either Truesdale or Nash had any role in placing him on EIS in May 2016. Rather, as noted, EIS automatically "begins on the seventeenth consecutive calendar day following the first day of unpaid sick leave." Doc. 64-2 at 75, 157.

Moreover, Hacker either does not maintain, or does not have any evidence showing, that the United employees who decided to suspend him or who determined that he met the conditions for being placed on EIS (exhausting his sick leave and then remaining unable to work for an additional sixteen days) were aware of his earlier lawsuit. Doc. 68 at pp. 13-14, ¶¶ 46-47. Accordingly, United is entitled to summary judgment on the ADA retaliation claim. *See Jones v.*

*Heartland Emp't Servs., LLC*, 721 F. App'x 547, 549 (7th Cir. 2018) (holding that the defendant was entitled to summary judgment given the absence of evidence that the plaintiff's coworkers and supervisors "knew about" his prior charge against his employer, "let alone that the charge motivated their conduct"); *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 698 n.6 (7th Cir. 2017) ("[I]n order to be liable for Title VII retaliation, the employer must have had actual knowledge of the protected activity at issue.") (internal quotation marks omitted); *Brown v. K.R. Miller Contractors Inc.*, 2018 WL 2966961, at *3 (N.D. Ill. June 13, 2018) (granting summary judgment where the relevant decisionmakers were not aware of the plaintiff's earlier complaints) (citing cases).

## Conclusion

United's summary judgment motion is granted. Judgement in its favor and against Hacker will be entered.

July 16, 2018

_____
United States District Judge